14 CV 7964

JUDGE KOELTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
KNOWLEDGE DELIVERY SYSTEMS, INC.,

                Plaintiff,

   - against -

KIMBERLY (BATES) HARRIS and JANE KENNEDY,

                Defendants.
-----------------------------------------------------------------x

**COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED OCT 02 2014 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff Knowledge Delivery Systems, Inc. ("Plaintiff" or "KDS"), by its attorneys, Dorsey & Whitney LLP, complaining of defendants Kimberly (Bates) Harris ("Harris") and Jane Kennedy ("Kennedy") (collectively, "the Defendants"), alleges as follows:

## I. THE PARTIES

1. The Plaintiff KDS is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

2. The Defendant Harris is a citizen of the State of New Jersey.

3. The Defendant Kennedy is a citizen of the State of Maryland.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, since KDS and the Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this action occurred in this District.

### III. EVENTS GIVING RISE TO THIS ACTION

### The Business of KDS

6.      KDS' mission is to help school districts provide professional-development services to dramatically improve teacher effectiveness and student performance. KDS systematically builds district-wide capacity to address the most important challenges faced by schools, including closing the achievement gap, implementing Common Core instruction and assessments, and providing coaching and instructional leadership. As such, KDS provides its services, in part, by contracting with local school districts throughout the country.

### The Defendant Harris

7.      Harris commenced her employment with KDS, including in its offices in New York, New York, on approximately June 1, 2012, as Vice President of Strategic Implementation, reporting directly to KDS' Chief Operating Officer. Harris' employment was subject to the KDS Employee Handbook, which she acknowledged with her signature on August 2, 2012. The KDS Employee Handbook prohibited her from, among other things, dividing loyalty "between KDS's interests and those of a competitor"; "divert[ing] or attempt[ing] to divert any KDS business opportunity to [her] or to any competing (or non-competing) entity"; and becoming "affiliated with, in any way, or employed by, either directly or indirectly, as an employee, advisor, consultant or independent contractor, an entity that:

- transacts or is seeking to transact business with the [sic] KDS or one of its affiliates;

- competes with the [sic] KDS or one of its affiliates; or

- produces or distributes a product or service similar to those that KDS produces or distributes, or is seeking to produce or distribute, including but not limited to

professional development services and/or online professional development courses for K-12 educators."

### The Defendant Kennedy

8. Kennedy commenced her employment with KDS, including in its offices in New York, New York, on approximately January 21, 2013, as Director of Implementation, reporting directly to Harris. Harris recruited Kennedy to join KDS, having previously worked with Kennedy at Houghton Mifflin Harcourt. Kennedy's employment was subject to the same KDS Employee Handbook provisions referenced in paragraph 7 above, which she acknowledged with her signature on January 16, 2013. In addition, Kennedy's employment was subject to the KDS Proprietary Information and Development Agreement that obligated her not to, "without [KDS's] prior written consent, solicit, recruit, incent, call upon, or induce others to solicit, recruit, incent, or call upon, directly or indirectly, any employee, consultant or advisor of [KDS], for the purpose of engaging the services of such person in a manner that would compete with, or compromise in any way, the services that such person provided to [KDS]."

### The Defendants' Fraudulent Scheme to Divert to Themselves and Their Undisclosed Business Partners KDS' Contract with the Chicago Public Schools and Related Conversion

9. On or about June 17, 2013, on behalf of KDS, the Defendants, along with other KDS employees, submitted a response to a Request for Proposal ("RFP") from the Chicago Public Schools to bid on a contract for professional development and related services to be provided pursuant to a federally funded program operated under the auspices of the Office of Strategic School Support Services ("OS4"), designed to improve the performance of low-performing schools. Among other things, the contemplated contract required the contractor to provide one-on-one professional development to teachers and principals.

10. On or about July 24, 2013, the Board of Education of the City of Chicago awarded the contract to KDS ("the OS4 Contract"). The OS4 Contract, executed on or about August 2, 2013, was for an initial one-year term (through July 31, 2014); with the Board of Education having the option to extend the contract for two additional one-year terms. Harris received a commission from KDS on any revenue from the OS4 Contract.

11. The Defendants had been two of the key KDS employees with respect to KDS' efforts to secure the OS4 Contract, because they had marketed KDS to the Chicago Public Schools and assisted in the preparation of KDS' response to the RFP.

12. The Defendants oversaw the implementation of the OS4 Contract, but neither they, nor anyone else at KDS, directly provided the one-on-one professional-development services and related services with teachers or principals. Rather, on or about September 1, 2013, KDS entered into certain agreements ("the ALS Contract") with a separate company, Action Learning Systems, Inc. ("ALS"), by which ALS became a subcontractor to KDS on the OS4 Contract. Pursuant to the ALS Contract, ALS was to provide the direct professional-development services, including in-class teacher and on-site principal coaching, administrative leadership and course design, with KDS' supervision.

13. Between approximately September 2013 and April 2014, Robert Crowe ("Crowe") and Kelly Smith ("Smith") were two of the principal ALS employees who worked with the Defendants to ensure that ALS implemented and supported the ALS Contract. As part of their responsibilities, Crowe and Smith trained the professional-development coaches selected and hired by KDS.

14. Beginning on or about January 1, 2014, the Defendants, along with ALS employees Kelly and Crowe, initiated a scheme with the goal of diverting for themselves the benefits of the OS4 Contract and to deprive KDS of the benefits of that contract.

15. On or about February 28, 2014, the Defendants along with Crowe and Smith secretly registered a new corporation, named Elevated Achievement Group ("EAG"), in the State of Delaware, as the vehicle and instrument through which they would compete with KDS and attempt to divert the benefits of the OS4 Contract to themselves. Harris took the position of Chief Executive Officer of EAG and Kennedy took the position of Chief Operating Officer. As set forth below, both Defendants secretly operated and furthered the interests of EAG, while they were still employed by KDS. EAG states that its mission "is to elevate student achievement through a disciplined process of continuous improvement for our educational partners."

16. As part of their scheme, the Defendants recruited Crowe and Smith to be officers of EAG in order to exercise total control over all aspects of the relationship with the Chicago Public Schools, including the professional-development services being provided by ALS. The Defendants named Crowe as the Chief Learning Officer and Smith as the Chief Research and Innovation Officer of EAG. Crowe and Smith resigned from ALS in early April 2014 to work full time for EAG.

17. Beginning in or about early April 2014, the Defendants falsely represented to their superiors at KDS that Crowe and Smith had simply decided to leave ALS and were working independently, when in truth and in fact, Crowe and Smith were working with the Defendants for EAG.

18. As part of their scheme, the Defendants arranged to have Crowe and Smith paid by KDS for the work with the Chicago Public Schools through a third party, the Sentarus Group

5

("Sentarus"), an accounting firm located in Marlton, New Jersey, not far from Harris' residence. The Defendants prepared a contract between Sentarus and KDS, which was never completed or executed by KDS, and which refers to Sentarus as the provider of education services. In a blatant misuse of her authority as an officer of KDS, between on or about April 17, 2014 and on or about May 19, 2014, Harris provided a copy of the putative Sentarus contract to a low-level KDS accounting employee and directed the employee to have KDS pay approximately eight separate invoices in the name of Sentarus for services ostensibly provided by Crowe and Smith at daily rates of $3,888, $888 higher than those previously charged to KDS by ALS for Crowe's and Smith's services. The approximately eight Sentarus invoices that the Defendants caused to be submitted to KDS totaled $427,251.27. Of that amount, Harris caused KDS to pay $323,074.08 to Sentarus.

19.     As part of the corrupt effort to have these invoices processed and paid by the low-level KDS accounting employee, on or about April 7, 2014, Harris falsely represented to the employee through the presentation of false, fictitious and misleading documentation that: 1) Crowe and Smith had been "fired" from ALS, when in truth and in fact, they had resigned from ALS to join EAG, and 2) KDS had entered into a consulting contract with Sentarus to deliver educational services for the period of August 5, 2013 through August 4, 2014, when in truth and in fact, Sentarus was not an educational consulting group, but an accounting firm, and no one at KDS (other than the Defendants and the low-level KDS accounting employee) was aware of or had ever approved any putative contract between Sentarus and KDS. Harris not only directed the low-level KDS accounting employee to pay these invoices, but also dictated to her the precise verbiage to include in corresponding invoices that Harris caused to be sent in the name of KDS to the Chicago Public Schools.

20.     Also as part of this scheme, on or about May 2, 2014, Harris submitted to the low-level KDS accounting employee a false and fictitious invoice in the name of Sentarus (one of the approximately eight invoices referenced above) for $222,000 for work described in the invoice as "educational consulting services related to OS4 in Chicago from April 16, 2014 through April 30, 2104" for "Saturday School Content 10 day complete teacher and student modules grade-span specific teacher – lessons and student materials. 10 Els Lessons (Grade ¾, 5/6 & 7/8) (Up to 125 teachers) – 10 Math lessons (Grades 3/4, 5/6, & 7/8). Copies for student use not included." KDS paid this invoice. In truth and in fact, there was no such work performed between April 16, 2014 and April 30, 2014 by the Defendants or anyone else, although work for Saturday School Content had been completed by ALS in January 2014 for a cost to KDS of $18,000.

21.     On or about April 30, 2014, Harris caused KDS to send an invoice to the Chicago Public Schools for $370,404 for the Saturday School Content, described in the invoice as "Lessons and Student Materials: 10 ELS Lessons, 10 Math Lessons (Up to 125 teachers)." The amount Harris received as a commission for this invoice was approximately $9,260, representing 2.5% of the $370,404 KDS billed to the Chicago Public Schools.

22.     KDS' proposal to renew the OS4 Contract for a second year (for approximately $6.3 million) was scheduled to be presented to the Chicago School Board in July 2014. As part their scheme, the Defendants remained at KDS until shortly before the expiration of the first one-year term of the OS4 Contract, in order to maximize their ability to divert the renewal of that contract from KDS to themselves. Thus, on or about June 2, 2014, the Defendants tendered their resignations to KDS, with their last day of employment being on June 13, 2014. On the same day, after announcing their resignations, the Defendants indicated that they would assist KDS in

7

securing the renewal and that such renewal was assured, but only if they were compensated for services to be provided pursuant to the renewal at a rate that was higher than that which the Chicago Public Schools would pay for those services. Also around that time, outside counsel for KDS, Jeffrey Fromm, had a conversation with Harris in which she stated in substance that KDS needed her and Kennedy to obtain the renewal of the OS4 Contract and to perform the work, and that she and Kennedy could perform the OS4 Contract without KDS. After KDS refused to bow to the Defendants' extortionate tactics, on or about August 1, 2014, the Chicago Public Schools sent to KDS a letter notifying it that the OS4 Contract would not be renewed.

23. In connection with the provision of services pursuant to the OS4 Contract, ALS, through Crowe and Smith, utilized ALS' intellectual property in the form of manuals, which were subject to valid copyrights, in order to train teachers and principals. On or about May 9, 2014, after Crowe and Kelly resigned from ALS, ALS sent them letters directing them to cease and desist from using ALS' copyrighted materials to train teachers pursuant to the OS4 Contract. On or about June 11, 2014, realizing that EAG would not be able to provide services pursuant to the OS4 Contract, were it to be renewed beyond the first one-year term, without ALS' copyrighted training materials, the Defendants telephoned the head of ALS and told her in substance, among other things, that ALS had to sell them the right to use the training materials for a mere $1,000 or ALS would never receive another contract with KDS. This conversation occurred without the participation or knowledge of anyone else at KDS and only two days before the Defendants' last day of employment with KDS.

24. In order to conceal their scheme, the Defendants, prior to leaving KDS, permanently deleted all of their emails and other electronic documents on KDS computers to which they had access in violation of federal criminal law, Title 18, U.S.C. 1030(a)(5)(A). It is

presently unclear whether the Defendants made copies of that data for their own use before destroying it.

## COUNT I
### Breach of Fiduciary Duty

25. Plaintiff KDS repeats and realleges the allegations of paragraphs 1 through 24 and incorporates them herein by reference.

26. As Vice President of Strategic Implementation and as Director of Implementation, respectively, Harris and Kennedy each owed KDS a fiduciary duty of the utmost good faith and loyalty, including a duty of candor, competence, and loyalty, and a duty not to exploit, in competition with KDS, contracts and future business opportunities with third parties, not to threaten any third party with which KDS had a contractual relationship, not to create false documentation to siphon KDS funds to themselves, not to operate a competing business, and not to destroy and steal KDS computer data.

27. By reason of the acts alleged herein, the Defendants violated each of these duties and KDS has been injured in an amount to be determined at trial amounting to at least $3 million.

## COUNT II
### Conversion

28. Plaintiff KDS repeats and realleges the allegations of paragraphs 1 through 27 and incorporates them herein by reference.

29. In or about May and June of 2014, the Defendants converted to their own use at least $220,000 in funds belonging to KDS and data that resided on KDS computers.

30. By reason of the acts alleged herein KDS has been injured in an amount to be determined at trial amounting to at least $3 million.

## COUNT III

### Breach of Contract

31. Plaintiff KDS repeats and realleges the allegations in paragraphs 1 through 30 and incorporates them herein by reference.

32. For good consideration, Harris and Kennedy during their employment with KDS, under the KDS Employee Handbook, as referenced in paragraphs 7 and 8 above, and which they both signed, were prohibited from, among other things, dividing loyalty "between KDS's interests and those of a competitor"; "divert[ing] or attempt[ing] to divert any KDS business opportunity to [themselves] or to any competing (or non-competing) entity"; and becoming "affiliated with, in any way, or employed by, either directly or indirectly, as an employee, advisor, consultant or independent contractor, an entity that:

- transacts or is seeking to transact business with the [sic] KDS or one of its affiliates;
- competes with the [sic] KDS or one of its affiliates; or
- produces or distributes a product or service similar to those that KDS produces or distributes, or is seeking to produce or distribute, including but not limited to professional development services and/or online professional development courses for K-12 educators."

33. For good consideration, Kennedy was obligated under her KDS Proprietary Information and Development Agreement not to "without [KDS's] prior written consent, solicit, recruit, incent, call upon, or induce others to solicit, recruit, incent, or call upon, directly or indirectly, any employee, consultant or advisor of [KDS], for the purpose of engaging the services of such person in a manner that would compete with, or compromise in any way, the services that such person provided to [KDS]."

34. KDS fully performed its obligations to Harris and Kennedy, but Harris and Kennedy breached their contractual obligations, as set forth above.

35. By reason of the acts alleged herein KDS has been injured in an amount to be determined at trial amounting to at least $3 million.

WHEREFORE, KDS prays for the following relief:

(i) an award of monetary damages against the Defendants in an amount to be determined at trial of at least $3 million;

(ii) an award of punitive damages according to the proof at trial;

(iii) injunctive relief;

(iv) an award to KDS of its costs and expenses in this action; and

(v) such other and further relief as the Court deems just and proper.

### JURY DEMAND

KDS hereby demands trial by jury of all issues.

Dated: New York, New York
October 2, 2014

DORSEY & WHITNEY LLP

By: _____
Nathaniel H. Akerman
Joshua Colangelo-Bryan
51 West 52nd Street
New York, New York 10019
Telephone: (212) 415-9200
Facsimile: (212) 953-7201
e-mail: akerman.nick@dorsey.com
colangelo.joshua@dorsey.com

*Attorneys for Plaintiff*
*Knowledge Delivery Systems, Inc.*

4814-5951-3088\1